IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
June 9, 2020 Session

## DOUGLAS D. DAILEY v. VIOLET L. DAILEY

**Appeal from the Circuit Court for Blount County**
**No. E-26797    Tammy M. Harrington, Judge**

_____

**No. E2019-00928-COA-R3-CV**

_____

This appeal arises from a divorce action.  During the trial court proceedings, the parties agreed on a distribution of a majority of the marital property.  However, a hearing was necessary concerning missing gold and silver that had been purchased during the marriage.  The Trial Court found Husband not to be a credible witness.  The Trial Court further found that the gold existed, that Husband had control of the safe room where the gold was located, and that Husband was responsible for the gold being missing.  Husband appeals the Trial Court's judgment to this Court.  Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

Melanie E. Davis and Ashley Bentley, Maryville, Tennessee, for the appellant, Douglas D. Dailey.

Craig L. Garrett, Maryville, Tennessee, for the appellee, Violet L. Dailey.

### OPINION

### Background

Douglas D. Dailey ("Husband") and Violet L. Dailey ("Wife") had been married for approximately forty years.  They had divorced once before in 1978 but had gotten back together and remarried.  It is undisputed that Husband purchased gold coins during the marriage.  Husband testified at trial that he had purchased approximately 400 ounces of

gold during a ten-year span. During his deposition, Husband testified that he had spent approximately "half a million dollars" on silver and gold, but he testified at trial that he did not think it was that much.[1] Wife testified that Husband told her the value of the gold was $750,000 on one occasion and $750,000 to $1,000,000 on another occasion. Husband testified that he purchased gold throughout the course of the marriage from 1997 or 1998 through 2008 or 2009. Husband kept no records of the gold he purchased during the marriage.

At first, Husband kept the gold coins in a gun safe. When the parties' son, Brent, was between fourteen and sixteen years old, he was angry with Husband for destroying his collectible cards and took some gold coins from the gun safe to replace his cards. According to Brent, Husband had left open the gun safe. Brent testified that he took only two gold coins.[2] Husband, however, stated that Brent took a little less than fifty ounces of gold. Wife stated in her testimony that Brent had taken only two or three coins. According to Brent, they took money from his bank account to replace the gold coins he had taken. Brent testified that he never took any other gold from his parents. Brent was thirty-two years old at the time of trial.

Husband testified that Brent also had taken money from his wallet, guns, and "just any kind of stuff like that he could get his hands on." Wife was asked on cross-examination whether Brent had stolen a Rolex watch. According to Wife, Husband said the watch was gone, but she saw him wearing it later. She also stated that Husband had accused Brent of stealing jewelry and had "tormented Brent" over it. Wife testified that Husband had placed the jewelry in a briefcase and later found it. Brent acknowledged taking money from his Father's wallet about three times when he was "young" and stealing from Walmart and, on one occasion, from his grandmother. Brent, however, denied taking any gold from Husband around the time the divorce was filed. Brent testified that only Husband had access to the safe room "because he's the only one that had the key."

After Brent took the gold coins as a teenager, Husband began keeping the gold coins in the bedroom. Husband alleged that Wife took approximately 100 ounces of gold in 2004. However, Wife admitted to taking only three to five gold coins when the parties previously divorced in 1978 to pay legal fees.

Husband subsequently began keeping the gold he purchased in a safe deposit box at CBBC Bank where he stored approximately 100 ounces of gold. In November 2009 when Husband sold his company, Underground Technology, he bought a large amount of gold

---

[1] During cross-examination, Wife's counsel pointed out inconsistencies between Husband's deposition testimony and his testimony at trial. According to Husband's counsel, Husband had cancer in the past that had affected his memory.

[2] During opening statements, Wife's counsel stated that according to Husband, all the gold bought by Husband came in one-ounce coins.

but is unsure of the amount.  This gold was stored in a safe deposit box at Peoples Bank. He had not bought gold since that time.  He estimated that there was over 200 ounces of gold in the safe deposit box at Peoples Bank.

Husband testified that he subsequently moved the gold from Peoples Bank back to the marital home shortly before "Trump's election" in 2016 upon Wife's request after their church "had a prophecy that President Obama would never come out of office" and Wife feared that they "wouldn't be able to get in the bank to get it."  Wife confirmed that a prophesy existed about "the signs of the times" but stated that she was only referring to removing the money they had in the bank and that she did not know the gold was being kept in the bank.  After Husband removed the gold from the bank, the gold was stored in the safe room in the downstairs of the home.

While both parties were living at the home prior to the divorce, Wife was living in the upstairs portion of the home and Husband lived in the downstairs portion of the home. The downstairs portion of the home was connected to the upstairs portion only by an elevator.  There was also an outside door to access the downstairs of the home.  It is undisputed that Husband often would leave the elevator door open downstairs so that the individuals upstairs could not access the downstairs portion of the home where Husband resided.  Only Husband and his mother, who lived "across the field," had keys to the outside door accessing the downstairs of the home.

Wife admitted that she had access to the downstairs of the home when Husband was not home on a few occasions to get meat out of the freezer in the basement.  She testified that on those occasions, she went to Husband's mother's home and borrowed the key to the outside door in order to access the downstairs portion of the home.  The lock on the safe room required a separate key.  According to Wife, Husband's mother never gave her a key to the safe room.  Wife testified that she never had a key to the safe room and had been inside the safe room only when Husband opened the door.  Husband testified that he sometimes left his keys in the door to the safe room because a dehumidifier had to be emptied often.  Wife, however, testified that she never observed Husband's key in the safe room door.  Wife further testified that Husband's key ring was a "huge thing of keys" the size of a "dinner plate" with approximately three hundred keys on it.  Husband acknowledged that the key ring had several keys on it and that it would not fit comfortably in your pocket.

Husband and Wife were both living in the marital home until Husband filed a petition for an order of protection in May 2016, and Wife was required to leave the home. According to Wife, the petition for an order of protection alleged in part that Wife had taken money from the parties' joint bank account but did not mention the gold being missing.  Wife admitted that she had taken $93,000 from the parties' joint bank account because she was afraid Husband would make her leave the home and she would be left

with no money. Husband further testified that about the same time, Wife had taken $15,000 hidden in a cinder block in the basement.

Husband testified that he learned the gold was missing around the time he filed for divorce but that he did not contact law enforcement because he was waiting to retrieve the video footage from the hard drive of the video surveillance equipment that recorded the entrance to the safe room. According to Husband, he planned to contact law enforcement about the missing gold after he had the video. However, Husband testified that the company and individual he had hired to retrieve the video footage were unable to retrieve it.

Shortly after he filed the petition for an order of protection, Husband also filed a complaint for divorce from Wife in May 2016 in the Blount County Circuit Court ("Trial Court"), alleging grounds of irreconcilable differences or, alternatively, that other grounds for divorce existed. Wife filed an answer and counter-complaint, alleging irreconcilable differences and that Husband was guilty of inappropriate marital conduct. Husband filed an answer to Wife's counter-complaint denying that he had committed inappropriate marital conduct.

The parties conducted discovery, which resulted in multiple motions to compel and for contempt. The Trial Court ultimately entered a decree of divorce in July 2018, awarding the parties a divorce on stipulated grounds pursuant to Tennessee Code Annotated § 36-4-129. The decree reflected the parties' agreement to auction several items of property. All remaining issues were reserved for further hearing.

In October 2018, the parties informed the court that they had reached an agreement on the pending motions before the court and a partial distribution of the marital property, which they stipulated was a fair and equitable distribution of the property. This agreement was memorialized in a court order entered November 2018. The partial distribution of property disposed of all property except for the missing gold and silver. Following a motion to alter or amend filed by Wife, the Trial Court subsequently modified the property distribution slightly due to the unavailability of an item of property to be awarded to Wife.

The Trial Court heard evidence on two nonconsecutive days in February 2019 concerning the missing silver and gold. During the second day of trial, Husband called Jackie Keck as a rebuttal witness. Ms. Keck testified that she was good friends to both Wife and Husband for approximately thirty years. She testified that she had been in the safe room with both of them. Ms. Keck testified at trial that when she first went to the parties' home, Wife had showed her around the home while Husband was not present. According to Ms. Keck, Wife showed her the downstairs and Ms. Keck recalled the safe being open. Wife also testified as a rebuttal witness. During her rebuttal testimony, Wife acknowledged that she showed Ms. Keck around the home but denied that she ever showed Ms. Keck the safe room without Husband being present.

Ms. Keck further testified that she recalled Husband and Wife arguing about Brent stealing guns, gift cards, and a Rolex watch. Additionally, Ms. Keck testified that she recalled an argument between Wife and Husband that had occurred ten years prior about one of Wife's friends. According to Ms. Keck, Husband stated during the argument that this friend helped Wife take some gold. She stated that this friend had come into the parties' lives after the 1970s and was associated with Wife's church. Wife denied in her rebuttal testimony that this argument occurred and that her friend had helped her steal gold. On cross-examination, Ms. Keck testified that Husband had given their granddaughter a Mercedes automobile.

Following the second day of trial, Wife filed a motion to reopen the proof after Ms. Keck allegedly stated to Wife while leaving court that Wife had "missed it by about Ten Million Dollars." Following the Trial Court's grant of Wife's motion, the Trial Court heard additional evidence in May 2019 from Wife and Ms. Keck. Ms. Keck denied that the conversation occurred.

The Trial Court subsequently heard closing arguments from the parties and issued its ruling. In its May 2019 final judgment, the Trial Court found as follows concerning the property at issue:

Based upon the testimony of the witnesses, the evidence presented, exhibits and arguments of counsel, the Court is of the opinion that there is missing gold which is a marital asset and the Court would make the following findings relative to this issue. This has been a hotly contested issue between the parties, but it is uncontested that $500,000 worth of gold was purchased and but for the small amount which the parties have divided by agreement in their February 19, 2019, announcement the vast majority of this gold is missing. The Court finds that there is no question that the gold was purchased, that the gold was in the bank and the same was removed based upon a prophecy that never occurred and the gold was then kept in the safe room. The safe room was in the marital residence which was occupied by the Husband and controlled by the Husband. Further, while the Husband has allegations regarding the Wife or their son taking the gold, the same is speculation and there is no proof to support that. The Court would note that there have been no records provided relative to the purchased gold despite attempts to get the Husband to provide records and that the Husband's testimony on the entire issue has been inconsistent and vague and he has expressed a cavalier attitude while testifying which reflects badly on the credibility of the Husband. The Court further finds that based upon all of the evidence that was presented, there is no question that this marital asset existed and it was in the control of the Husband, Douglas Dailey, and that he is responsible for this marital asset being gone and missing and therefore, he

owes to the Wife the value of half of the gold. The Court finds that the preponderance of the evidence indicates that there is 487 ounces of missing gold and finds that the value of the missing gold is $600,000. The Court finds that the Husband, Douglas D. Dailey, is responsible and owes to the Wife, Violet L. Dailey, one-half (1/2) of this amount or $300,000 for which she receives judgment and a lien on the real property previously awarded by the Court to the Husband, Douglas D. Dailey.

Husband timely appealed to this Court.

## **Discussion**

Although not stated exactly as such, Husband raises as issues on appeal the following: (1) whether the Trial Court erred by finding by a preponderance of the evidence that Husband had stolen or absconded with the missing gold and awarding Wife one-half the value of the missing gold, (2) whether the Trial Court erred by classifying the missing gold as marital property, and (3) whether the Trial Court erred in awarding one-half the missing gold as marital property when it was no longer in existence. Wife raises one issue for our review on appeal as follows: whether the Husband's appeal is frivolous such that she should be awarded attorney's fees incurred during the appeal.

Our review is de novo upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014). A trial court's conclusions of law are subject to a de novo review with no presumption of correctness. *Kelly*, 445 S.W.3d at 692.

We first address Husband's issue that the evidence did not support the Trial Court's finding that Husband was responsible for the disappearance of the gold. According to Husband, "[t]he record and the proof simply do not support the finding by the Trial Court that [Husband] is legally responsible for the gold going missing." We disagree.

Importantly, we note that the Trial Court found Husband not to be credible due to his "cavalier attitude" and the inconsistent and vague testimony he had provided throughout the proceedings. As our Supreme Court has instructed:

When credibility and weight to be given testimony are involved, considerable deference must be afforded to the trial court when the trial judge had the opportunity to observe the witnesses' demeanor and to hear in-court testimony. *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997) (quoting *Randolph v. Randolph*, 937 S.W.2d 815, 819 (Tenn. 1996)). Because trial courts are able to observe the witnesses, assess their demeanor, and evaluate other indicators of credibility, an assessment of credibility will

not be overturned on appeal absent clear and convincing evidence to the contrary. *Wells v. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

*Hughes v. Metro. Gov't of Nashville and Davidson County*, 340 S.W.3d 352, 360 (Tenn. 2011). As instructed in *Hughes*, we provide great deference to the Trial Court's credibility determinations, which will not be overturned on appeal unless clear and convincing evidence proves otherwise. No such clear and convincing evidence exists in this case as to Husband's credibility.

During trial, Husband argued that he had not taken the missing gold and that it was either Wife or the parties' son, Brent, who took the gold. Husband argued during trial that because Wife had taken some gold and sold it at one point during the marriage, she must have necessarily taken this gold as well. As part of his argument on appeal, Husband states that Wife "had stolen the parties' gold before and sold it" and refers to Wife as a thief. During oral arguments, Husband's counsel stated that Wife "had stolen in the past from the marital estate." First, we point out that the gold sold by Wife during the marriage was marital property belonging jointly to both Husband and Wife. Thus, Wife had not stolen the gold as Husband alleges. Second, other than his own uncredible testimony, Husband offered no proof that Wife had taken the missing gold at issue from the safe room.

Husband alternatively argued that their son, Brent, was responsible for the missing gold. Husband testified that Brent had, in the past, taken gold coins, money from his wallet, and guns from Husband. Brent admitted to taking two gold coins when he was a teenager, which was approximately fifteen years prior, but denied taking any gold since. Brent also acknowledged that he had stolen from Walmart and, on one occasion, his grandmother. Other than Husband's speculative testimony, which the Trial Court deemed as not credible, Husband provided no other evidence to prove that Brent was actually the individual to take the gold from the safe room.

The evidence presented during trial supported the Trial Court's finding that Husband had control over the gold at the time it disappeared. The Trial Court found that the gold at issue was kept in the safe room in the marital home that was occupied and controlled by Husband. At the time the divorce was filed, Wife was not residing in the home. Prior to filing the divorce complaint, Husband had filed a petition for an order of protection, which resulted in Wife being required to leave the marital home. Even when Wife was residing in the home, Husband had almost exclusive access to the downstairs except that Wife had borrowed a key from his Mother a couple of times and Husband had sometimes allowed Wife to access the downstairs when he was home.

When Wife accessed the basement of the home, the key provided to Wife by Husband's mother did not open the safe room where the gold was located, only the basement door. Wife testified that she was only ever in the safe room when Husband was present to open the safe room door. Nonetheless, Husband claimed that Wife had access

to the safe room because she had occasional access to the basement and that the key to the safe room was often left in the lock. However, Husband's testimony was deemed to not be credible. Wife testified that Husband kept all of his keys on one very large key ring, and Wife denied that she ever observed the key left in the lock to the safe room. Brent also testified that no one except Husband had access to the safe room because, to his knowledge, Husband was "the only one that had the key."

Additionally, as the Trial Court noted, Husband had a "cavalier attitude" during his testimony. Husband testified at trial that he first began investigating the missing gold around the time he discovered that the money was missing from the parties' joint checking account. However, Husband did not contact law enforcement to report the gold as stolen or mention the missing gold in his petition for an order of protection, wherein he alleged in part that Wife had taken money from the parties' joint bank account. Although Husband testified that he did not report the gold as missing or mention it in the petition because he expected to find who took the gold on the security system, Husband was not credible. The Trial Court found that Husband was "responsible for this marital asset being gone and missing," and the evidence presented during trial does not preponderate against that finding. We, therefore, find Husband's argument in this regard to be without merit and determine that the evidence presented supports the Trial Court's findings that Husband had control over the gold and the safe room where the gold was located and that Husband was responsible for the gold being missing.

We next address Husband's final two issues regarding whether the Trial Court erred by classifying the missing gold, which he alleges did not exist, as marital property and awarding half of the value of the gold to Wife.[3] Although Husband raises these as two separate issues, we will address them together as they are interrelated. According to Husband, the gold at issue was missing when the divorce case was initiated and therefore did not exist to be classified as marital property subject to equitable distribution. Husband relies on *Flannary v. Flannary*, 121 S.W.3d 647 (Tenn. 2003) to support his argument that the Trial Court erred by treating the missing gold as marital property. Wife, however, argues that the present case is distinguishable from *Flannary*.

In *Flannary*, a husband withdrew $48,000 from the parties' savings account in 1999 due to the Y2K scare and placed the money in a drawer in his home. *Id.* at 649. The husband intended to re-deposit the money back into the account after January 1, 2000. *Id.* However, the money was missing when he went to re-deposit it. *Id.* Both parties denied taking the money. *Id.* Our Supreme Court held in *Flannary* as follows:

---

[3] Although Wife correctly states in her appellate brief that Husband did not challenge the classification of the missing gold as a marital asset at trial, we note that during closing arguments, Husband's counsel questioned the Trial Court's ability to determine how much gold existed at the time of the divorce and when the gold went missing. As such, we will exercise our discretion and address Husband's remaining issues on appeal.

Under the definition found at Tennessee Code Annotated section 36-4-121(b)(1)(A), the missing funds are not "marital property" that is subject to division. It is undisputed that the money was missing before Husband filed for divorce, and both parties testified that the money was not in their possession. Furthermore, the trial court concluded that anything could have happened to the money and stated that "neither one of [the parties] knows what happened to it." Thus, it appears from the record that the property was not owned by either of the parties as of the date the complaint for divorce was filed. Accordingly, this property does not fit within the definition of "marital property" and should not have been divided as part of the marital estate. [Tenn. Code Ann. § 36-4-121(b)(1)(A) (2001)]*; see also Brock* [*v. Brock*]*,* 941 S.W.2d [896,] 900 [(Tenn. Ct. App. 1996)] (stating that "property once owned by a spouse, either as separate property or marital property, but not owned by either spouse at the time of divorce, is not subject to classification and division or distribution when the divorce is pronounced").

*Flannary*, 121 S.W.3d at 650.

We determine this case to be distinguishable from *Flannary*. In *Flannary*, the trial court found that the money was not in existence when the divorce action began. *Id.* The trial court in *Flannary* further found that neither party knew what happened to the missing money. *Id.* Because the missing money was not owned by either party at the time of the divorce action, the Tennessee Supreme Court determined that the money was not marital property and was not subject to division as part of the marital estate. *Id.*

Conversely, the Trial Court in this case found that the missing gold existed, that it was within Husband's exclusive control, and that Husband was responsible for the gold being missing. Although Husband claims on appeal that the missing gold did not exist, the Trial Court found that it did exist. The only evidence to the contrary was Husband's testimony that the Trial Court found to be not credible.

Husband argues in his appellate brief that the present case is similar to *Flannary* because "[i]n both instances, something of value went missing with no explanation as to where it went" and one spouse was awarded half the value of the missing items. However, this argument mischaracterizes the Trial Court's findings in the present case. The Trial Court in this matter found that the gold existed and that Husband was responsible for the gold being missing. As such, this case is not a situation where there is "no explanation as to where [the gold] went" as Husband argues. Based on the foregoing, we find Husband's argument in this regard to be without merit and that the Trial Court did not err by determining the missing gold was a marital asset subject to division as marital property. Additionally, the Trial Court did not err by awarding to Wife one-half the value of the

missing gold upon its determination that Husband was responsible for the gold's disappearance.

We next consider the issue raised by Wife regarding whether Husband's appeal is frivolous. "'A frivolous appeal is one that is 'devoid of merit,' or one in which there is little prospect that [an appeal] can ever succeed.'" *Morton v. Morton,* 182 S.W.3d 821, 838 (Tenn. Ct. App. 2005) (quoting *Industrial Dev. Bd. of the City of Tullahoma v. Hancock,* 901 S.W.2d 382, 385 (Tenn. Ct. App. 1995)) (other internal citations omitted). In pertinent part, Tennessee Code Annotated § 27-1-122 (2017) addresses damages for frivolous appeals stating:

> When it appears to any reviewing court that the appeal from any court of record was frivolous or taken solely for delay, the court may, either upon motion of a party or of its own motion, award just damages against the appellant, which may include, but need not be limited to, costs, interest on the judgment, and expenses incurred by the appellee as a result of the appeal.

A successful party should not be forced to bear the costs and vexation of a baseless appeal, nor should appellate courts be saddled with such appeals. *See Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 342 (Tenn. 2010). However, the courts must take care not to discourage legitimate appeals and should only impose a penalty pursuant to Tennessee Code Annotated § 27-1-122 in rare and obvious cases of frivolity. *Id.* Whether to award damages due to a frivolous appeal is a discretionary decision by the appellate court. *Young v. Barrow*, 130 S.W.3d 59, 66-67 (Tenn. Ct. App. 2003). Based on the evidence presented during trial and the Trial Court's finding that Husband was not credible, we find that Husband's appeal had little prospect of success. We, therefore, hold that this appeal was frivolous, and we award Wife her attorney's fees on appeal. We remand this case to the Trial Court for a determination of the appropriate amount of attorney's fees.

## Conclusion

The judgment of the Trial Court is affirmed in its entirety, and this cause is remanded to the Trial Court for a determination of an appropriate award to Wife of her attorney's fees on appeal and for collection of the costs assessed below. The costs on appeal are assessed against the appellant, Douglas D. Dailey, and his surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE

- 10 -